IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHNSON W. GREYBUFFALO,

      Plaintiff,

     v.                              Case No. 15-cv-8-bbc

EDWARD WALL, et al.,

      Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Johnson Greybuffalo is an inmate currently housed at the Wisconsin Secure Program Facility. He is suing Kelli Willard West and Samuel Appau on claims under the First Amendment free exercise clause, and Edward Wall, Gary Boughton, and West under the Religious Land Use and Institutionalized Persons Act for the denial of his request to recognize the Native American Church as one of the Department of Corrections's umbrella religion groups. The court allowed Greybuffalo to proceed on his claims that these defendants violated his rights by prohibiting him from engaging in devotional services with other members of the Native American Church and from purifying himself in a sweat lodge according to the principles of the Native American Church.[1] (Dkt. 5 at 6.) But the defendants are not prohibiting Greybuffalo from engaging in these religious activities, the existing

---

[1] The court also allowed Greybuffalo to proceed on a claim that the defendants prohibited him from having religious feasts after religious ceremonies. (Dkt. 5 at 6.) But the court dismissed this claim for failure to exhaust available administrative remedies in an order dated August 28, 2015. (Dkt. 30.)

policy can accommodate these activities under the Native American umbrella religion group. Now before the court is the defendants' motion for summary judgment.

## ISSUES PRESENTED

Under the RLUIPA and the First Amendment free exercise clause, an inmate must show that the actions of government officials have substantially burdened his religious practice. Here, Greybuffalo's request for the Native American Church to be a separate umbrella religion group was denied. But Greybuffalo's desired religious services and property can be accommodated under the existing policy without the need for a separate umbrella religious group. Did the defendants substantially burden Greybuffalo's religious practice?

## STATEMENT OF THE CASE

### A.    Parties.

Defendant Edward Wall is the Secretary of the Wisconsin Department of Corrections.[2] Kelli Willard West is the religious practices coordinator and administrative policy advisor for the Department of Corrections (Department).[3] Gary Boughton is the warden of the Wisconsin Secure Program Facility in Boscobel, Wisconsin (Boscobel).[4] Samuel Appau was the chaplain at Waupun Correctional Institution (Waupun) until November, 2012, when he left state service.[5]

---

[2] Defs' Proposed Findings of Fact (DPFOF) ¶ 2.
[3] DPFOF ¶ 3.
[4] DPFOF ¶ 5.
[5] DPFOF ¶ 6.

Plaintiff Johnson Greybuffalo is an inmate who is presently incarcerated in Boscobel.[6] Before Boscobel, Greybuffalo was incarcerated in Waupun.[7]

Greybuffalo is a member of the Sisseton-Wahpeton Oyate tribe, which is part of the Sioux tribe primarily located in South Dakota.[8] The Sisseton-Wahpeton Oyate are practitioners of the Native American Church, also referred to as Peyotism.[9] [10]

**B.    The Department's umbrella religion groups.**

The Department has 8 umbrella religion groups, which are inclusive groups designed to appeal to a wide range of religious beliefs within a given faith tradition: Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Jewish, Native American/American Indian, Pagan, and Protestant/Other Christian.[11] Each umbrella group has congregate services for the purpose of worship and spiritual expression embracing a wide range of religious beliefs.[12] The Department also offers study groups for congregate religious study within a given umbrella group for the purpose of increased knowledge and spiritual growth.[13]

---

[6] DPFOF ¶ 1.
[7] DPFOF ¶ 1.
[8] DPFOF ¶ 2.
[9] DPFOF ¶ 2.
[10] Peyote is a plant that produces a hallucinogenic effect when ingested by humans. Greybuffalo is not requesting use of this hallucinogen as part of this lawsuit. (Am. Compl., Dkt. 4 at 11.)
[11] DPFOF ¶¶ 12-14.
[12] DPFOF ¶ 15.
[13] DPFOF ¶ 15.

### C.     Native American/American Indian umbrella religion group programming.

Boscobel offers a monthly sweat lodge ceremony and a pipe and drum group service every other week for the Native American umbrella religion group.[14] Inmates may also receive pastoral visits from approved pastoral visitors, including Native American Church clergy or representatives.[15]

The Department recognizes that the sweat lodge ceremony is an important part of the Native American religious practice.[16] The sweat lodge is conducted by an outside volunteer who is a recognized Native American spiritual advisor and who has been trained in performing the sweat lodge ceremony that he conducts.[17]

At Boscobel, the sweat lodge ceremonies are lead by Brian Krist and there are approximately 16 inmates who regularly participate, including Greybuffalo.[18] The sweat lodge takes place outside in an area monitored by security, but isolated from the general areas of the institution.[19] Each sweat lodge is approximately 3.5 hours long.[20] It starts around 7:30 a.m. and goes until 11:00 a.m.[21] A few days before the ceremony is set to occur, Chaplain David Ewing takes some of the Native American inmates to the designated area to build the fire.[22] They sprinkle the tobacco blend over the area where the fire will be built and offer up prayers.[23] Then

---

[14] DPFOF ¶¶ 71, 87.
[15] DPFOF ¶ 62.
[16] DPFOF ¶ 68.
[17] DPFOF ¶ 69.
[18] DPFOF ¶¶ 72-73.
[19] DPFOF ¶ 73.
[20] DPFOF ¶ 74.
[21] *Id.*
[22] DPFOF ¶ 76.
[23] *Id.*

they stack the stones and cover them with wood, while offering prayers. The remaining wood is stacked and covered up with tarps.[24] The day of the sweat lodge ceremony, Ewing starts the fire at 6:00 a.m., and the inmates come to the area at 7:30 a.m.[25]

The inmates smudge and then begin setting up the lodge and preparing the medicine water. This usually takes approximately 20 minutes. After smudging, the inmates will have a pipe ceremony. Then they will enter the lodge, leaving two inmates outside to keep the fire.[26] The sweat lodge is a time of prayer, purification and reflection. At around 10:45 a.m., the inmates begin taking the lodge down and return to the housing units around 11:00 a.m. for the institution count.[27]

Boscobel also holds pipe and drum congregate services for the Native American umbrella group on the second and fourth Fridays of the month.[28] This service is held for an hour.[29] The pipe and drum service is considered a study, so it can be facilitated by the institution chaplain or other staff members, rather than a volunteer spiritual leader from the community.[30]

Inmates who identify their religious preference under the Native American umbrella religious group may also identify as part of the Catholic or Protestant umbrella religious groups because some of the religious practices fall under both

---

[24] *Id.*
[25] DPFOF ¶ 77.
[26] DPFOF ¶ 78.
[27] DPFOF ¶ 79.
[28] DPFOF ¶ 87.
[29] *Id.*
[30] DPFOF ¶ 88.

categories.[31] Inmates may then participate in group religious services offered in both of their chosen umbrella groups.[32]

The chaplain of the institution generally recruits outside volunteers to lead congregate religious services at the institution.[33] Boscobel's chaplain welcomes suggestions from inmates for potential volunteers to lead services.[34] If a spiritual leader from the Native American Church was willing to volunteer to lead a religious study group, the pipe and drum study, or the sweat lodge, the volunteer would have to complete the Division of Adult Institutions' volunteer application form.[35] The applicant's credentials are verified and he or she must also pass a background check. Once the applicant is approved, he or she is entered into the Division's volunteer database. After completion of an orientation session, the volunteer may lead services at any institution in Wisconsin.[36]

### D.    Native American/American Indian religious property.

The Department allows inmates to possess religious property for individual practice in their cell or for use in congregate services.[37] The property specifically allowed for the Native American umbrella group includes an abalone shell, cedar, ceremonial pipe and bag, eagle feather or red-tail hawk feather, feathers/feather fan, eagle bone whistle, medicine bag, sage, sweetgrass, Kinick Kinick/sacred

---

[31] DPFOF ¶ 32.
[32] DPFOF ¶ 34.
[33] DPFOF ¶ 92.
[34] *Id.*
[35] DPFOF ¶ 97.
[36] DPFOF ¶ 98.
[37] DPFOF ¶¶ 23-26.

tobacco, and sweat lodge items.[38] The institution provides a lighter, towels, rocks, wood, tarp and shovel to handle the hot rocks for the sweat lodges. The institution will store items brought in by the spiritual leader or donated to the institution, including a drum, wooden staff, colored ribbon or streamers, bucket, dipper/ladle, sage, sweetgrass, cedar, fire wood, tarp/blanket/canvas to cover lodge, buffalo skull, deer antlers, willow poles, and spirit foods.[39]

At Boscobel, the Native American umbrella group stores property for use at congregate services in a cart maintained by the chaplain.[40] The property includes a larger drum with a stand, drum sticks, a smaller drum, feather fan, abalone shell, corn dipper, sage, sweetgrass, sacramental tobacco, two deer antlers, leather rattle, gourd rattle, pipe, and cedar.[41]

### E.   Greybuffalo's request for a new umbrella religion group.

The Department has a designated form to request a new religious practice or property item that is not currently allowed at the adult institutions.[42] An inmate must write a detailed description of the religious practice or activity that he wants to participate in and what the request is based on. The inmate must submit this completed form to the chaplain or the chaplain's designee. The chaplain then makes a recommendation to approve or deny the request and submits it to his or her supervisor for review and recommendation. The supervisor then forwards the request with his or her recommendation to the Department's religious practices

---

[38] DPFOF ¶ 26.
[39] DPFOF ¶ 26.
[40] DPFOF ¶ 80.
[41] DPFOF ¶¶ 81-82, 84
[42] DPFOF ¶ 35.

advisory committee. The committee reviews the request and any supporting documentation and consults with other staff and community spiritual leaders as needed. The committee makes a recommendation to the institution's warden and returns the form to the institution for a final decision. An inmate may appeal a denial of a request through the inmate complaint review system.[43]

At Waupun, Greybuffalo completed a request for a new religious practice in January of 2012 with Appau.[44]   Appau recommended approval and forwarded the request to his supervisor.[45]

Appau left his employment with Waupun in November, 2012.[46] Greybuffalo was transferred to Boscobel in January, 2013.[47] At Boscobel, Greybuffalo discovered that his request for a new religious practice was never received by the Department's central office for review by the religious practices advisory committee.[48]

On April 30, 2013, Greybuffalo completed another request for a new religious practice and sent it to the programs supervisor at Boscobel.[49] Greybuffalo requested that the Department "officially recognize the Native American Church as one of its 'Umbrella' Group Religions; and, with such recognition would come an accompanying Property List that would include, but not be limited to: Water Drum, Gourd Rattle, Eagle-Bone Whistle, Ritual/Ceremonial Staff, Feather Fan (Wing, Flat, or Loose), Feather, Cedar, Sage, Flag Root, Tobacco, Corn Husks, Corn Pollen,

---

[43] DPFOF ¶ 35.
[44] DPFOF ¶¶ 49-50.
[45] DPFOF ¶ 53.
[46] DPFOF ¶ 7.
[47] DPFOF ¶ 1.
[48] DPFOF ¶ 60.
[49] DPFOF, ¶ 61..

Sacred Medallion, Medicine Bag, 'Peyote' Box, Traditional Clothes (such as a Ribbon Shirt, Bandana, Necktie, Bolo, Decorated/Beaded Vest, Hairpipe Breastplate, and Pendleton)."[50]

On July 12, 2013, on behalf of the religious practices advisory committee, West recommended denial of the request for a separate umbrella religion group for the Native American Church.[51] West thoroughly explained the reason for the recommendation for denial:

> Recommend denial.  Inmate requests that DOC establish a separate Umbrella Religion Group (URG) for the Native American Church. The URG structure was established with consultation from community spiritual leaders, Federal Bureau of Prisons (BOP) chaplains and others to help WI-DOC meet spiritual needs of as many inmates as possible within the limits of institution time, space, staff, volunteer and resource availability.  Note that the supporting documents submitted by Mr. Greybuffalo are within the Religious Practices Advisory Committee (RPAC) historical files, as they were given full review and consideration at the time the Native American URG was established in DOC policy.
>
> The URGs were designed to accommodate the breadth of sub-group/denomination beliefs and practices with similar theology, to be more cohesive than dissimilar and to represent the broad faith traditions of Wisconsin and its inmate population.  It would be impossible for WI-DOC to provide congregate programming to accommodate all inmate spiritual practices because of the wide diversity and sometimes very individualistic nature of religious beliefs and practices.  For instance, consider four rather divergent denominations of Christianity.
>
> **Pentecostal Christians** believe that the "manifestations of the Holy Spirit" arc alive, available, and experienced by modern-day Christians. These manifestations  or gifts include such things as discerning of spirits, tongues and interpretation of tongues. Many

---

[50] DPFOF ¶ 61.
[51] DPFOF ¶ 62.

Pentecostal Christians practice immersion Baptism of persons of an age whereby the person is considered sufficiently mature to make that decision, although some believe in Baptism by spirit. No Pentecostal church baptizes infants.

**<u>Jehovah's Witnesses</u>** are another protestant denomination. Jehovah's Witnesses practice immersion baptism of persons of a sufficient age to make an informed decision; infants are not baptized. Jehovah's Witnesses beliefs reject the Trinity (Father, Son, and Holy Spirit) and the Trinity plays no role in baptism in this faith group. Instead of the Trinity, Witnesses hold that only Jehovah is God, that Jesus was created by Jehovah and is inferior to him, and that the Holy Spirit is a force of Jehovah.

The **<u>Methodist</u>** branch of protestant religion traces its roots back to 1739 where it developed in England as a result of the teachings of John Wesley. Unlike Jehovah's witnesses, Methodists accept the Trinity. Wesley's three basic precepts that began the Methodist tradition consisted of: 1. Shunning evil and avoiding partaking in wicked deeds at all costs, 2. Performing kind acts as much as possible, and 3. Abiding by the edicts of God the Almighty Father. The most fundamental distinction of Methodist teaching is that people must use logic and reason in all matters of faith. Methodist Christians generally practice baptism by sprinkling, although baptism by pouting or immersion is also offered, but rarely performed. Unlike Jehovah's Witnesses, Methodist Christians generally baptize infants. The vast majority of Methodists do not speak in tongues.

For **<u>Lutherans</u>**, baptism is a sacrament and a means of grace. The mode of application in a Lutheran baptism is not important and it is usually delivered by the pouring or sprinkling of water while it is, nevertheless, considered a total spiritual washing and rebirth. There is no proper, awaited age for baptism, as the work in baptism is seen to be God's, thus infants are baptized, usually by sprinkling, as soon as possible. The only necessities for a valid baptism in the Lutheran faith are "water and the Word;" and baptisms must be performed in the Trinitarian formula (in the name of the Father, the Son, and the Holy Spirit.) Lutherans accept the trinity. Very few Lutherans speak in tongues.

Despite these significant differences in belief and practices, all of the above-referenced Protestant denominations are included in the Protestant Umbrella Religion Group (URG). However, it is up to inmates who self-identify as Protestant to choose which particular services to attend. The chapel calendar will reflect such things as "Protestant services provided by XYZ Pentecostal Church" or "Protestant services provided by ABC Methodist Church" or "Protestant services provided by DEF Kingdom Hall of Jehovah's Witnesses" or "Protestant Services provided by LMN Congregation of the Wisconsin Evangelical Lutheran Synod." Inmates of a particular Protestant denomination may choose not to attend services provided by a denomination with divergent values from his or her home church. Similarly, an [sic] Native American Church inmate may choose to which services to attend, and which services not to attend, based upon who will be performing the services.

For these reasons, it is highly unlikely that URG programming will meet all inmate spiritual needs. Inmates are encouraged to select the URG that most closely matches their group worship/study goals, and to address other spiritual needs by carrying out personal religious practices, pastoral visits, etc. under DAI 309.61.01, 309.61.02 and 309.61.03. Wisconsin policies provide accommodation to all religious beliefs/traditions in the least restrictive means possible by allowing a breadth of religious practice opportunities, including:

- individual practices permitted under DAI 309.61.01 (e.g. individual study, personal meditation, other religious observances in their living quarters and written correspondence with fellow adherents)
- attend Umbrella Religion Group (URG) programming per the inmate's choice (i.e. not dictated by DOC) which most closely meets their needs for congregate worship and study
- participate in their designated URG's Annual Religious Celebratory Meal/Observance
- attend facility special events of a spiritual nature
- receive Pastoral Visits from approved pastoral visitors; Native American Church clergy or representatives may apply for Pastoral Visitor status or may request placement on the inmate visiting list
- excuse from work/program for religious observance
- obtain personal religious property permitted under DAI

11

309.61.02, including allowable books and literature

- receive religious diet accommodation permitted under DAI 309.61.03, including personal fasting observances (only consecutive, multi-day fasting rituals are offered bag meal accommodation)

This is comparable to the manner that non-incarcerated individuals select a faith community that best meets their congregate practice needs and complements or supplements with individual study and practices such as prayer, meditation, pastoral care, service, etc.[52]

The warden at the time, Tim Haines, denied Greybuffalo's request for a separate religious umbrella group on July 19, 2013.[53]

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and when the moving party is entitled to a judgment as a matter of law. The moving party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "An adverse party may not rest upon mere allegations or denials of his pleadings, but his response must set forth a specific showing that there is a genuine issue for trial." *Id.* at 322.

---

[52] DPFOF ¶ 62.
[53] DPFOF ¶ 62.

ARGUMENT

I.   **DENIAL OF GREYBUFFALO'S REQUEST FOR A NEW UMBRELLA RELIGION GROUP WITHSTANDS SCRUTINY UNDER RLUIPA.**

   A.   **Overview of the law.**

Inmates alleging that government officials have impeded their ability to practice their religious beliefs have two means of recourse: the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, and the free exercise clause of the First Amendment. RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." *Cutter v. Wilkinson,* 544 U.S. 709, 714-15 (2005).  The protections afforded by RLUIPA apply where:

   (1) The substantial burden is imposed in a program or activity that receives Federal financial assistance; or

   (2) The substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1(b). Under the statute, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). There is no dispute that RLUIPA applies to the Department.

To prove a RLUIPA claim, an inmate bears the burden of establishing that he has a sincere religious belief and that his religious exercise was substantially burdened. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015); 42 U.S.C. § 2000cc-2(b). If the

plaintiff makes his required showing, the burden shifts to the defendants to demonstrate that their actions further "a compelling governmental interest," and do so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). If a plaintiff prevails on a RLUIPA claim, he is limited to declaratory and injunctive relief; he cannot obtain money damages. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012).

For the purpose of summary judgment only, the defendants presume that Greybuffalo's religious beliefs are sincere. But the defendants submit that Greybuffalo has not shown his religious exercise is substantially burdened. And the denial of his request for an umbrella religion group is the least restrictive means of furthering a compelling government interest.

### B. Greybuffalo's religious practice is not substantially burdened under RLUIPA.

#### 1. The substantial burden test.

Greybuffalo bears the burden of proving that the defendants' actions substantially burdened his religious exercise. 42 U.S.C. § 2000cc-1(b)(1). Although RLUIPA does not define the term, the Supreme Court recently articulated that a "substantial burden" exists where the restriction requires an inmate to "engage in conduct that seriously violates his religious beliefs." *Holt*, 135 S. Ct. at 862 (alterations omitted) (observing that a policy that forces a prisoner to choose between violating his beliefs and facing discipline is a substantial burden, but noting that the defendant did not contest that its policy was a substantial burden); *see also, Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)

(discussing this standard under RFRA). In *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015), the court expressed uncertainty as to the meaning of the test adopted by *Holt*:

> The Supreme Court's formulation leaves a lot of uncertainty. How is a court to tell whether a given restriction "seriously" violates or contradicts religious beliefs? What, indeed, does "seriously" mean?— more than "modestly" and less than "overwhelmingly," but there's a lot of space in that range.

*Schlemm*, 784 F.3d at 364-65. The court went on to note that the substantial burden test articulated in *Holt* and *Hobby Lobby* is now controlling. *Schlemm*, 784 F.3d at 364.

While the Seventh Circuit has not directly defined "substantial burden" under RLUIPA post-*Holt*, decisions under RFRA and the First Amendment—both of which require a showing of substantial burden—provide guidance. In these contexts, courts are instructed to "evaluate[ ] the coercive effect of the governmental pressure on the adherent's religious practice." *Korte v. Sebelius,* 735 F.3d 654, 683 (7th Cir. 2013). In short, to determine if a plaintiff's religious exercise has been substantially burdened, the court must look to the "sever[ity]" of the "consequences" of noncompliance. *Hobby Lobby,* 134 S. Ct. at 2775. Specifically, it must determine whether the government is compelling an individual to "perform acts undeniably at odds" with his beliefs, *Wisconsin v. Yoder,* 406 U.S. 205, 218 (1972), or putting "substantial pressure on [him] to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, (1981).

15

Applying the substantial burden element, it is also appropriate to consider the Supreme Court's emphasis that RLUIPA seeks to alleviate only "exceptional government-created burdens on private religious exercise." *Cutter,* 544 U.S. at 720. So "incidental effects of government [policies], which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not constitute substantial burdens. *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51 (1988) (describing First Amendment standard that RLUIPA was intended to emulate).

>   **2.    There is no evidence that the Department's umbrella group religion policy seriously violates Greybuffalo's religious beliefs.**

Greybuffalo cannot prove that the Department's umbrella religion group policy seriously violates his religious beliefs because his beliefs can be accommodated under the existing policy. Here, Greybuffalo asserts that the denial of his request for a new umbrella religion group violates his rights under RLUIPA because he cannot engage in devotional services with other members of the Native American Church, nor purify himself in a sweat lodge according to the principles of the Native American Church. Greybuffalo is misguided. Nothing in the existing policy restricts Greybuffalo's ability to engage in devotional services and sweat lodges according to the Native American Church principles.[54]

Greybuffalo testified at his deposition that he would be satisfied if Native American Church services could be included under the current umbrella religion

---

[54] DPFOF ¶¶ 66, 90-93, 96-98.

group policy as part of the Native American group religion.[55] Boscobel's chaplain welcomes suggestions from inmates for potential volunteers to lead services.[56] If a spiritual leader from the Native American Church is willing to volunteer to lead a religious study group, the pipe and drum study, or the sweat lodge, the volunteer would have to complete the Division of Adult Institutions' volunteer application form. The applicant's credentials must be verified and he or she must also pass a background check. Once the applicant is approved, he or she is entered into the Department's volunteer database. After completion of an orientation session, the volunteer may lead services at any institution in Wisconsin.[57]

As for property, most of the property items Greybuffalo lists as accompanying recognition of the Native American Church are already allowed under the existing policy. Nothing prevents Greybuffalo from purchasing the allowed items to either keep in his cell or donate to the Native American group for use in congregate services.  Indeed, some of the inmates who identify with the Native American group pooled their money and purchased a drum to use for group services at Boscobel. (Depo at 35-36.) Greybuffalo contributed to this purchase. (*Id.*)

In addition to the group property for the Native American congregate services, Greybuffalo possesses a bald eagle feather and a medicine bag that contains sage, cedar, sweet grass, tobacco, bitterroot, a piece of stone from a sweat lodge, and buffalo hair. (Depo at 21-22.) He is able to keep these items in his cell for personal use.

---

[55] DPFOF ¶ 99.
[56] DPFOF ¶ 92.
[57] DPFOF ¶ 97-98.

17

Finally, Greybuffalo's participation in the Native American services presently offered at Boscobel does not seriously violate his religious beliefs.[58] For example, during the sweat lodge ceremonies, Greybuffalo sings the traditional Sioux songs, rather than traditional Native American Church songs.  He testified that singing the Sioux songs, rather than the Native American Church songs, does not seriously violate his religion and that he is able to get religious significance from the sweat lodge ceremony as it is at Boscobel.[59]

The denial of Greybuffalo's request for a new umbrella religion group does not substantially burden Greybuffalo's religious practice because his desired services and property can be accommodated under the existing policy. Thus, defendants Wall, Boughton and West are entitled to summary judgment on this RLUIPA claim.

### C.      Denial of Greybuffalo's request for a new umbrella religion group is the least restrictive means of advancing compelling penological interests.

Under RLUIPA, once a prisoner has shown that the actions of government officials have substantially burdened the exercise of his religious beliefs, the burden shifts to the defendants to demonstrate that their decision was the least restrictive means of furthering a compelling government interest. *Cutter,* 544 U.S. at 712. In weighing the governmental interests involved, the Supreme Court has urged deference to prison administrators. *Id.* at 722-723. Indeed, when applying

---

[58] DPFOF ¶ 102.
[59] DPFOF ¶ 103.

RLUIPA, "context matters in the application of that standard." *Id.* at 722. As the Court affirmed,

> [w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.

Id. at 722. "It bears repetition," Justice Ginsberg wrote, "that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." Id. at 725, n.13. Lawmakers supporting RLUIPA anticipated that

> courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.'

*Id.* at 722 (citing Joint Statement S7775 (quoting S.Rep. No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp 1892, 1899, 1900)). The Court more recently advised that "in applying RLUIPA's statutory standard, courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *Holt*, 135 S. Ct. at 866.

Equitable allocation of scarce prison financial resources is a compelling governmental interest. *See Cutter,* 544 U.S. at 726 (under RLUIPA, if request is "excessive, impose[s] unjustified burdens on other institutionalized persons, or jeopardize[s] the effective functioning of an institution, the prison [is] free to resist the imposition"); *see also Chance v. Texas Dep't of Crim. Justice,* 730 F.3d 404, 414 (5th Cir. 2013) (finding "compelling interests in prison administration, resource allocation and cost control").

Correctional facilities have a finite amount of staff, space and time available for programming.[60]  If limited resources had to be repeatedly subdivided among an ever-increasing number of different religions and religious factions, each group would have fewer and less frequent congregate religious services and studies.[61] This would make it impossible for the Department to provide congregate programming in an equitable manner, and would favor religious adherents over non-religious inmates.   Redirecting more-and-more resources toward religious programming would ultimately reduce resources available for the Department's other core missions, including rehabilitation programming (e.g. anger management, AODA, domestic violence, sex offender treatment), offender accountability, and facility and community safety.[62]

The use of umbrella groups allows the Department to use its limited resources as efficiently as possible to accommodate the greatest number of inmates with meaningful congregate religious programming.[63] Umbrella religion groups allow groups with similar beliefs and practices to share resources.[64] Without the use of these groups, inmates would ultimately have fewer opportunities for congregate religious practice.[65]

The evidence shows that the Department's umbrella religion group structure furthers compelling state interests of uniformity, cost-efficiency, and equitable allocation of scarce prison resources. It is also the least restrictive means because it

---

[60] DPFOF ¶¶ 19, 22.
[61] DPFOF ¶ 21.
[62] DPFOF ¶ 21.
[63] DPFOF ¶¶ 19-20.
[64] DPFOF ¶ 18.
[65] DPFOF ¶ 21.

allows the greatest number of inmates the most meaningful opportunities for religious exercise as is possible. And it does not restrict individual religious practice in the inmate's cell, personal meditation, utilization of religious books and/or property, pastoral visits, correspondence with other practitioners, etc.[66]

The defendants are entitled to summary judgment on Greybuffalo's RLUIPA claim because the use of umbrella groups is narrowly tailored to serve compelling governmental interests related to prison resource allocation and security.

## II. DENIAL OF GREYBUFFALO'S REQUEST FOR A NEW UMBRELLA RELIGION GROUP WITHSTANDS SCRUTINY UNDER THE FIRST AMENDMENT FREE EXERCISE CLAUSE.

### A. Overview of the law.

The free exercise clause of the First Amendment guarantees every individual the right to freely exercise his or her religion and "requires government respect for, noninterference with, [ ] religious beliefs and practices." *Cutter*, 544 U.S. at 719. The court allowed Greybuffalo to proceed on his free exercise claim against Appau and West. To prevail on a free exercise claim, Greybuffalo must meet two requirements.

First, Greybuffalo must show that the government has placed a substantial burden on a central religious practice. *Id.; Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005). Second, Greybuffalo must demonstrate that the government has intentionally targeted a particular religion or religious practice. *Sasnett v. Sullivan,* 91 F.3d 1018, 1020 (7th Cir.1996), *vacated on other grounds,* 521 U.S. 1114 (1997).

---

[66] DPFOF ¶ 11.

In the prison setting, and under First Amendment scrutiny, an inmate's ability to practice his religion may be circumscribed by restrictions that are reasonably related to legitimate penological interests. *Tarpley v. Allen County, Indiana,* 312 F.3d 895, 898 (7th Cir. 2002). In determining whether government conduct is reasonably related to a legitimate penological interest, the court considers four factors:  (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates and the allocation of prison resources; and (4) whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. *Tarpley,* 312 F.3d at 898 (citing *Turner v. Safley,* 482 U.S. 78, 89–91 (1987)).

### B.  Denial of Greybuffalo's request for a new umbrella religion group survives First Amendment scrutiny.

The protections offered by the First Amendment are more limited than those extended under RLUIPA. So any claim that fails under RLUIPA will fail inevitably under the First Amendment's more deferential standard. *Mark v. Gustafson*, 482 F. Supp. 2d 1084, 1090 (W.D. Wis. 2006). *Perez v. Frank*, 433 F. Supp. 2d 955, 964 (W.D. Wis. 2006). In this case, because the denial of Greybuffalo's request for a new umbrella religion group survives scrutiny under RLUIPA,[67] the defendants have necessarily met the less stringent burden of

---

[67] *See* section I.C., *supra.*

showing that the practice is reasonably related to a legitimate penological interest under the First Amendment. *Borzych,* 439 F.3d at 390 (declining to consider a prisoner's constitutional claims, and considering solely his RLUIPA claim after noting the heightened protections it offers). The *Koger* court also found that a separate First Amendment analysis was unnecessary where the RLUIPA analysis effectively resolved the issues, noting:

> We call to mind the principle that "federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 552 (7th Cir. 2001).

*Koger*, 523 F.3d at 801; *see also, Schlemm*, 784 F.3d at 363, (bypassing analysis of inmate's First Amendment free exercise claim because RLUIPA "provides greater protection"). Because Greybuffalo's RLUIPA claim fails on its merit, his First Amendment free exercise claim also must fail.

### C.   Greybuffalo's religious practice is not substantially burdened under the First Amendment.

The Seventh Circuit has reaffirmed the application of the substantial burden test to inmate First Amendment claims such as Greybuffalo's.  *See, Kaufman v. Pugh*, 2013 WL 4256968, *3, *5 (7th Cir. Aug. 16, 2013) (affirming dismissal of atheist inmate's First Amendment free exercise claims because he "did not show that the [restrictions] would impose a substantial burden on his practice of atheism."). So the substantial burden test remains an element that must be proven by inmate plaintiffs to substantiate both a First Amendment free exercise claim and a claim under RLUIPA. *Id.*; *Kaufman*, 419 F.3d at 683; *Hernandez v. C.I.R.,* 490

U.S. 680, 699 (1989). For the same reasons advanced above in Argument I(B)—including all of the other opportunities he has to exercise his Native American Church faith—Greybuffalo is unable to sustain this burden. On this basis, alone, summary judgment is proper.

### D.   The umbrella religion group policy is a rule of general applicability.

As part of his First Amendment free exercise claim, Greybuffalo must also demonstrate that West or Appau intentionally targeted his particular religion or religious practice. *Sasnett,* 91 F.3d at 1020. In other words, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993) (citation omitted). If the rule applies to everyone without regard to a particular religion, there is no constitutional violation. *Employment Div. Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 887 (1990); *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006); *Kaufman*, 419 F.3d at 682-683; *Koger,* 523F.3d at 796 ("*Unlike cases arising under the Free Exercise Clause of the First Amendment*, this prohibition [on imposing substantial religious burdens] applies even where the burden on the prisoner results from a rule of general applicability.") (Emphasis added and internal quotations omitted); *see also, Civil Liberties for Urban Believers*, 342 F.3d at 796; *Borzych*, 439 F.3d at 390.[68]

---

[68] Courts in other circuits have similarly continued to apply the "generally applicable" principles set forth in *Smith* to inmate First Amendment claims, despite a determination that the *Turner / O'Lone* "reasonably-related" standard also applies. *See, Hines v. South Carolina Dept. of Corrs.,* 148 F.3d 353, 357 (4th Cir. 1998); *Young v. Saunders*, 34 F. App'x 925, 926 (4th Cir. 2002); *Braithwaite v. Hinkle*, 752 F. Supp. 2d 692, 697 (E.D. Va. 2010); *Motto v. Rider*, 2008 WL 4224814 (S.D. W. Va. 2008); *Gresham v. Granholm*, 2009 WL 497666 (W.D. Mich. 2009); *McKinnedy v. Kee-Lippe*, 2012 WL 848283 (D. S.C. 2012.

In this case, there is no dispute that the Department's umbrella religion group policy is a rule of general applicability. Under the First Amendment, neutral and uniform application of prison rules and regulations that have an incidental effect on religious practices does not violate the First Amendment. *Smith,* 494 U .S. at 879. Thus, the requirement to request property and services through a recognized umbrella group does not violate the First Amendment because it is a requirement that applies to all inmates regardless of their religion. West and Appau are entitled to summary judgment on Greybuffalo's free exercise claim.

### E.     Appau did not violate Greybuffalo's First Amendment rights.

Greybuffalo asserts that Appau violated his rights under the First Amendment free exercise clause because of a delay in the decision on his request for a new religious practice. But Appau recommended that the new religious practice be tentatively approved, forwarded the request on to his supervisor, and recalls the request being further mailed to the central office for the religious practices advisory committee's review.[69]  For an unknown reason, the request was not received by the committee.[70]

There is no evidence that would support an inference that Appau targeted adherents of the Native American Church. *Smith-Bey v. Dodd*, 2013 WL 5366393 (S.D. Ind. Sept. 25, 2013) (dismissing inmate free exercise claim under *Smith*, where defendant prison staff did not target Islam, but were following a neutral law of general applicability). Appau was following the neutral policy that requires all

---

[69] DPFOF ¶¶ 53, 57.
[70] DPFOF ¶ 59.

inmates to request new religious property and services through a recognized umbrella group using the process from the Department's policy DAI #309.61.01.[71]

Appau does not know why or how Greybuffalo's request was lost in transmission to the committee in Madison.[72] But "we do not charge government officials with constitutional-level violations because they make mistakes on the job …. To do so would subject government officials to unending litigation challenging the quality of their job performance." *Shesler v. Sanders*, No. 13-CV-394-JDP, 2014 WL 5795486, at *1 (W.D. Wis. Nov. 6, 2014).

Here, there is no evidence that Appau intentionally destroyed or delayed Greybuffalo's request. Even during the delay, Appau worked with Greybuffalo to try to find a Native American Church pastor. He contacted a potential pastor and explained the process for him to come to the institution to lead Native American Church services. The pastor indicated that he would contact Appau if he was able to make room in his schedule to volunteer to lead these services. The pastor had not contacted Appau before Appau left his employment with the Department.[73] Thus, even during the accidental delay, Appau was actively working with Greybuffalo to find a pastor to lead services.

Finally, Appau did not have authority to approve, deny, or implement a new religious practice at Waupun.[74] In his role as chaplain, Appau made a recommendation – here it was approval – and then routed the request to his

---

[71] DPFOF ¶ 35.
[72] DPFOF ¶ 59.
[73] DPFOF ¶¶ 54-56.
[74] DPFOF ¶¶ 43-44, 52

26

supervisor and eventually the committee. The committee then recommends approval or denial to the institution warden, who has the final say in approving, denying, and implementing a new religious practice.[75] Appau was not personally involved in the final decision to deny Greybuffalo's request and Greybuffalo's First Amendment claim against him should be dismissed.

### F.   West did not violate Greybuffalo's First Amendment rights.

There is no evidence that West intentionally targeted practitioners of the Native American Church faith. West's recommendation to deny Greybuffalo's request for a new umbrella religion group was one step in the process of a neutrally applicable policy for requesting a new religious practice.

On behalf of the religious practices advisory committee, West recommended denial of Greybuffalo's request for a new umbrella religion group.[76] The reason for the recommendation was because Greybuffalo's religious practice can be accommodated under the existing umbrella religion group structure. Being denied an entirely new umbrella religion group does not mean that inmates do not have the option of practicing their beliefs.[77] In her declaration, West stated that the Department would "welcome Native American Church leaders to apply as volunteers to facilitate the Native American umbrella religion group services."[78] Having multiple volunteers from various subgroups of an umbrella group to conduct religious services is a valuable resource for the Department's institutions to provide

---

[75] DPFOF ¶¶ 43-44, 52-53.
[76] DPFOF ¶ 62.
[77] DPFOF ¶ 67.
[78] DPFOF ¶ 90.

religious congregate programming.[79] Thus, the denial of Greybuffalo's request does not restrict him from participating in devotional services or ceremonies because these services can be accommodated under the existing umbrella group structure without the need to create a new umbrella group.

West also did not have the final authority to approve and implement or deny Greybuffalo's request.[80] Only the warden has the ultimate authority to approve or deny a new religious practice.[81] Here, former-Warden Tim Haines denied Greybuffalo's request.[82]

Greybuffalo's First Amendment claim against West should be dismissed.

## III.   WEST AND APPAU ARE ENTITLED TO QUALIFIED IMMUNITY ON GREYBUFFALO'S FIRST AMENDMENT CLAIMS FOR MONEY DAMAGES.

Even if the court declines to grant summary judgment on the basis of the undisputed facts presented above, West and Appau are entitled to summary judgment on Greybuffalo's First Amendment free exercise claims because they are immune from suit for any money damages under the doctrine of qualified immunity.

### A.   Overview of the law.

Qualified immunity protects government officials from facing suits for damages when their actions do not violate clearly established constitutional or statutory rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts a qualified-immunity defense, the plaintiff has the burden to

---

[79] DPFOF ¶ 91.
[80] DPFOF ¶¶ 43-44.
[81] DPFOF ¶ 43.
[82] DPFOF ¶ 62.

establish that the defendant's action violated a clearly established right. *See Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010). To be clearly established, a right "must be sufficiently clear that ***every*** reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* —— U.S. ——, 132 S. Ct. 2088, 2093 (2012) (internal quotations and brackets omitted) (emphasis added). This is a high bar. *Kramer v. Pollard*, 497 F. Appx. 639, 642 (7th Cir. 2012) (unpublished).  To defeat a qualified-immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question ***beyond debate*.**" *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S. Ct. 2074, 2083 (2011) (emphasis added). Courts may decide qualified-immunity cases on the ground that a defendant's action did not violate a clearly established right without reaching the question of whether a constitutional right was violated at all. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

### B.     West and Appau did not violate any of Greybuffalo's rights.

Courts have held that the Department's use of umbrella religion groups in prisons passes constitutional scrutiny under both RLUIPA and the free exercise clause. *Charles v. Verhagen*, 220 F. Supp. 2d 937, 947, 2002 WL 2012625 (W.D. Wis. 2002) *aff'd,* 348 F.3d 601, 2003 WL 22455960 (7th Cir. 2003); *Easterling v. Pollard*, No. 10-CV-779, 2012 WL 666797, at *7 (E.D. Wis. Feb. 29, 2012) *aff'd,* 528 F. App'x 653, 2013 WL 3787486 (7th Cir. 2013). As these cases demonstrate, an inmate has no clearly established right to a new umbrella religion group.

For the reasons argued above in section II, West and Appau are entitled to qualified immunity because they did not violate any of Greybuffalo's clearly established constitutional rights under the free exercise clause.

## CONCLUSION

The defendants request that defendants' motion for summary judgment be GRANTED, dismissing the case in its entirety and with prejudice.

Respectfully submitted,

BRAD D. SCHIMEL
Attorney General


s/Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
(608) 267-8906 (Fax)
bachhuberrl@doj.state.wi.us